THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH THOMPSON, Defendant-Appellant.

First District (2nd Division)   No. 1—03—1946

Opinion filed June 22, 2004.

Anita Rivkin-Carothers, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Kelly Rodgers, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

In this case we apply a recent United States Supreme Court decision that changed the way courts are to analyze sixth amendment confrontation clause issues.

Following a jury trial, defendant Kenneth Thompson was found guilty of aggravated domestic battery, aggravated battery and unlawful restraint. He was sentenced to three years in prison for aggravated domestic battery and concurrent prison terms of two years for aggravated battery and two years for unlawful restraint. On appeal, defendant contends the trial court erred by allowing the prosecutor to impeach his testimony with inadmissible hearsay evidence. He further

contends the State failed to prove him guilty beyond a reasonable doubt and that his sentences are excessive. For the reasons that follow, we reverse the judgment of the circuit court and remand this case for proceedings consistent with this opinion.

FACTS

At trial, Streamwood police officer Gregory Myers testified that on March 31, 2002, he was assisting in an investigation regarding a missing person at 11 Glendale Court. About 8 a.m., he saw LeKeisha McAllister walking nearby and noticed that she was naked and holding a door mat to cover herself. Officer Myers saw that LeKeisha was crying, that her face was swollen, and that she had bruises on her shoulder, back, buttocks, and legs. LeKeisha also had duct tape on her neck and in her hair. Officer Myers covered LeKeisha with his jacket and placed her in the back of his squad car until an ambulance arrived to transport her to the hospital.

Cindy Barwegen testified that she was LeKeisha's nurse from the time Lekeisha arrived at the hospital until she was discharged. When LeKeisha arrived at the hospital she was wrapped in a sheet and appeared to be frightened, with her hands and legs drawn to her body. She also complained about pain on the right side of her face. Barwegen gave LeKeisha warm blankets and an ice pack because she had a black eye and her face and lips were swollen. LeKeisha also had bruises on the right side of her face and forehead and duct tape in her hair, which Barwegen cut out and gave to the evidence officer. Barwegen further noted that LeKeisha had bruises on her upper right arm, upper forearm and wrist area and duct tape attached to this area. She also had bruises on her buttocks, her knee and thigh areas, her right upper shoulder, her front lower shoulder, her left upper lateral arm and her ankles.

Dr. Mark Giacomin testified that he examined LeKeisha on the date in question and found that she had a ruptured eardrum, facial fracture and multiple contusions. He also observed that LeKeisha had extensive bruising on both sides of her forehead, her cheeks, upper lip, left hip, both knees, buttocks, neck, left upper arm and right shoulder. There was tape on her back and in her hair. Dr. Giacomin determined LeKeisha's injuries were the result of blunt force which could have been from a closed fist or blunt object. LeKeisha was in pain and appeared to be frightened. Dr. Giacomin treated her for the pain and arranged counseling for her.

Streamwood police officer William Husfield testified that he is a trained crime scene technician and was asked to assist in the investigation of a missing person on the morning of March 31, 2002. Officer

Husfield drove around looking for the missing person for about an hour, then went to 11 Glendale Court to process a crime scene. The officer took photographs of the outside of the residence, which showed vehicles and a trailer parked in the court. Officer Husfield also took photographs of the inside of the residence, which included a wastebasket full of duct tape next to the bed in the master bedroom, a dresser next to the bed, an earring on the floor near the wastebasket, and clothing on the floor next to the bed. The officer photographed the bent-out window screen in the master bathroom and the closet in the master bedroom. There was a partial roll of duct tape inside of the closet and a hamper in front of it. He also photographed the headboard of the bed, which had a partial roll of duct tape on it, the back of the bed where a steak knife was located, the floor and bathtub in the master bedroom, which had suspected bloodstains, and a belt which was next to the bed. Officer Husfield found a belt buckle and a pin for the buckle on the floor near the wastebasket. His later photograph of LeKeisha's face showed she was wearing one earring that matched the earring he had photographed in the bedroom.

Detective Alexander VanDerLinden testified that on March 31, 2002, he was assigned to assist in the investigation. The detective spoke with defendant, who informed him that his fiancée, LeKeisha, was missing. The defendant repeatedly played a voice mail tape. After obtaining defendant's permission, Detective VanDerLinden looked through the house for evidence relating to LeKeisha's whereabouts and noticed what appeared to be dried blood on the floor and moist blood in the bathtub of the master bathroom. Detective VanDerLinden notified Sergeant Zigler, who told everyone to leave the residence and called an evidence technician to process the scene.

Detective VanDerLinden went to the police station and spoke with defendant and LeKeisha's two daughters, Kiera and Keona. After gathering evidence and speaking with the girls, the focus of the investigation changed from that of a missing person to one criminal in nature focused on the officers' belief that something had happened to LeKeisha.

About 7:30 a.m., Detective VanDerLinden was informed that LeKeisha had been located. Shortly thereafter, Detective VanDerLinden and Commander Keegan told defendant that officers had located LeKeisha. They advised him of his *Miranda* rights. Defendant waived his rights and said he had an argument with LeKeisha regarding bills he had discovered. Defendant called LeKeisha on the telephone to find out when she would be home from work and told her that he was going to teach her a lesson. When LeKeisha arrived, the children were watching television downstairs and LeKeisha and defendant went

upstairs to watch a movie in the bedroom. During the movie, defendant locked the bedroom door and at some point LeKeisha took off her clothing. Defendant then confronted LeKeisha with the bills and accused her of having an affair with a man named "Tim." Defendant struck LeKeisha in the mouth with a closed fist, bound her arms and torso with duct tape, then placed a piece of tape over her mouth. He repeatedly pulled the tape off and then placed it back on LeKeisha's mouth to torture her and get the truth from her. Defendant also pinned LeKeisha down on the bed by placing both knees on her arms and straddling her chest. After cutting the duct tape off of her with a knife, defendant struck LeKeisha repeatedly in the face with his open hand then used a belt to strike her body. Defendant was interrupted by the children and he told them to go back downstairs. He then told LeKeisha to go into the bathroom and take a shower, and pushed her into the bathtub. She fell and hit her mouth, causing her to bleed. Defendant again was interrupted by the children and went downstairs to see them. When defendant returned to the upstairs bathroom, LeKeisha was gone.

Detective VanDerLinden interviewed defendant for a second time about 45 minutes after the first interview. During the second interview, defendant stated that he struck LeKeisha with an open hand rather than a closed fist. Detective VanDerLinden then spoke to LeKeisha and showed her the knife and belt recovered from the scene.

Defendant testified that he is the chief executive officer and president of a national debt collection agency. On the day in question, he had lived with his fiancée, LeKeisha, and their two children, Keona and Kiera, for about five years. After defendant and LeKeisha had discussed going to Wisconsin for the weekend, defendant left work about 5:30 p.m. to prepare for the trip. Defendant and the two children drove to their home in Streamwood, and LeKeisha arrived there about 7 p.m. Defendant and the two children then drove to Arlington Heights to pick up their trailer home at defendant's office, stopped to purchase groceries and arrived at his sister's home in Forest Park about 10:15 p.m. to pick up his niece. Defendant's niece did not want to go with him, and he left about 20 minutes later. As he drove home, defendant attempted to call LeKeisha's cellular telephone to see if she was ready, but she did not answer. After checking LeKeisha's voice mail, defendant was horrified, called his sister, and asked her to call police. Police officers arrived at his home about 12:30 a.m., and defendant played the voice mail for them numerous times and provided them with a physical description of LeKeisha and information about her family and friends. Defendant also gave police his cellular telephone and permission to search his home.

At the police station, defendant waived his *Miranda* rights and spoke with police officers. He denied telling them that he "beat" Le-Keisha or tied her up with duct tape. Defendant also testified that he never threatened to physically hurt LeKeisha and that he never had a domestic violence issue with her.

On cross-examination, the State attempted to introduce an order of protection that was issued against defendant in the present case. Defense counsel objected to the use of the order for impeachment purposes. He claimed defendant's testimony referred to the fact there was no past history related to domestic violence and that the issuance of an order of protection does not mean any domestic violence actually occurred. The State argued that the order of protection directly impeached defendant's testimony that he never had a domestic violence issue with LeKeisha.

The court overruled defense counsel's objection, and the State questioned defendant regarding the allegations made by LeKeisha in the order of protection issued April 1, 2002. The prosecutor asked defendant if he was aware that the petition stated: LeKeisha lived with defendant on March 31, 2002, at 11 Glendale Court in Stream-wood; at about 12:45 a.m., LeKeisha asked defendant to give her a back rub; LeKeisha went into the bathroom and defendant got duct tape and placed it around her body from her mouth to her upper torso and arms, then strapped her to the bed; defendant repeatedly struck LeKeisha with his hands and a belt causing her to sustain a broken nose, ruptured eardrum, multiple bruises, and blackness to both eyes.

Defendant said he did not agree to have the order of protection issued against him. He denied LeKeisha's allegations. The parties then stipulated to defendant's prior conviction for bank fraud in the Northern District of Illinois.

The jury found defendant guilty of aggravated domestic battery, aggravated battery, and unlawful restraint. At the sentencing hearing, LeKeisha testified defendant was a "perfect provider" for their two daughters and supported them financially, emotionally and psychologically. LeKeisha also said defendant did not tie her up with duct tape and strike her body on the day in question, but that a man named "Timothy" was responsible for those acts.

Teresa Mull testified she had known defendant since high school and that he was the father of her son Keenan. Mull said defendant provided financial support for her son and never displayed any violent behavior toward her or her son.

Adslee Munir then testified he had known defendant since 1995 and worked for defendant's company. Munir never observed defendant display any violence toward any individual.

Reverend Ellis May testified he had known defendant since 1995 and that his children always took priority. Reverend May also described defendant's work ethic, commitment to his family, and involvement in the community. Finally, defendant spoke on his own behalf and described his involvement and commitment to his family.

Following the hearing, defendant was sentenced to three years in prison for aggravated domestic battery and concurrent prison terms of two years for aggravated battery and two years for unlawful restraint.

DECISION

Defendant first contends the trial court improperly allowed the State to impeach his testimony with the unsubstantiated hearsay allegations contained in the petition for an order of protection. The State concedes use of this document to impeach defendant was improper, but argues that any resulting error was harmless.

We find LeKeisha's statements not only were inadmissible hearsay, but were admitted in violation of defendant's rights under the confrontation clause of the sixth amendment, which provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. We also find this error was not harmless.

In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Supreme Court overruled the long-standing reliability framework for the admissibility of out-of-court statements contained in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

■ In *Crawford*, the Court held the sixth amendment confrontation clause excludes a declarant's out-of-court testimonial statements, offered for their truth, unless the declarant is unavailable to the proponent of the evidence and the defendant had an opportunity to cross-examine the declarant. Indicia of reliability play no role in this confrontation clause analysis. *Crawford*, 541 U.S. at 68-69, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

The Court declined to define what it meant by "testimonial." But it gave some examples of testimonial statements—testimony at preliminary hearings, testimony before a grand jury or at a prior trial, in-court guilty plea statements of co-conspirators to show existence of a conspiracy, and statements made during police questioning, including accomplice statements and statements against penal interest. There is no confrontation clause issue when the declarant is on the witness stand. Nor does the confrontation clause bar admission of a defendant's inculpatory statements. See *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Whether *Crawford* encom-

passes statements made to people who are not law enforcement officials is a question left open by the decision.

■ New rules of criminal procedure that expand the rights of the accused have retroactive application to criminal cases pending on direct review. *People v. Ford*, 198 Ill. 2d 68, 72-73, 761 N.E.2d 735 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987), and *People v. Hudson*, 195 Ill. 2d 117, 745 N.E.2d 1246 (2001). Since *Crawford* was decided during the pendency of this direct appeal, our examination of the admissibility of the allegations contained in the petition for an order of protection is directed by the new rule announced by that case. The State makes no claim that the defendant waived his confrontation clause objection.

■ Here, the circuit court admitted LeKeisha's written statements made in the course of obtaining an order of protection from the court. Defendant had no opportunity to cross-examine her. Under *Crawford*, those statements are testimonial. They would not be admissible under the confrontation clause unless LeKeisha were unavailable to testify and defendant had a prior opportunity for cross-examination. LeKeisha was not unavailable to the State. She did testify at the sentencing hearing. In addition, the defendant did not have a prior opportunity for cross-examination. Therefore, the admission of the hearsay statements made by LeKeisha violated defendant's sixth amendment right to confront the witnesses against him.

We must now determine whether the confrontation clause error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). In *People v. Wilkerson*, 87 Ill. 2d 151, 157, 429 N.E.2d 526 (1981), our supreme court outlined three approaches for measuring error under *Chapman*: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence.

Here, Officer Husfield provided testimony describing the physical condition of defendant's residence, where the crime took place, and the physical evidence observed there. The evidence also included defendant's initial statements to Detective VanDerLinden describing his violent actions toward LeKeisha and physician testimony describing LeKeisha's injuries. However, at trial, defendant denied the inculpatory statements attributed to him by the police officers and claimed that he never threatened to physically hurt the victim. The statements made by LeKeisha were the only other evidence presented at trial to identify defendant as LeKeisha's attacker. There is a reason-

able probability the admission of those statements contributed to the conviction.

In addition, the evidence in this case was not overwhelming. Defendant denied the statements attributed to him by police officers, and the other evidence only provided a description of the crime scene and physical evidence from the scene. LeKeisha's statements named defendant as her attacker. We conclude the confrontation clause error in this case was not harmless beyond a reasonable doubt.

Because double jeopardy bars retrial after reversal where the evidence at the first trial was not sufficient to support conviction, we must review defendant's claim of insufficiency of evidence. *People v. Jackson*, 348 Ill. App. 3d 719, 738 (2004), citing *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995). In doing so, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 348 Ill. App. 3d at 738. We consider all the evidence introduced at the original trial, even if erroneously admitted. *Jackson*, 348 Ill. App. 3d at 738.

In this case, the evidence at defendant's first trial was sufficient to support conviction. Defendant's initial statement regarding his violent actions toward LeKeisha was consistent with the injuries she sustained as a result of blunt force. In addition, the physical condition of defendant's residence, where the crime took place, corroborated the events described in defendant's statement, as did the physical evidence observed there. Without determining defendant's guilt or innocence, we find the evidence was sufficient to support conviction and retrial is not barred on double jeopardy grounds.

We reverse the judgment of the circuit court of Cook County and remand this case for proceedings consistent with this opinion.

Reversed and remanded.

CAHILL and GARCIA, JJ., concur.